With respect to the obviousness issue, the District Court made a series of factual findings regarding a state of uncertainty in the prior art, the fact that nothing in the prior art would lead to the conclusions that are set forth in the claim to vengeance, and the fact that the patent claim limitations were nowhere to be found in the prior art. Can I ask you a really unrelated question first, just to get it off the table quick? Yes. Claim construction. I was struggling to understand, did the District Court make a non-infringement finding, or was there some sort of stipulation based on the real-time versus, oh boy, I suddenly don't remember the other name, for the claim construction issue that you appealed? Yes. The court's claims construction that expressly excluded... Versus endpoint, yeah. Yes. Non-time versus endpoint. The court's claims construction that expressly limited the claims to endpoint PCR... No, what I'm trying to understand is, is the issue properly before us? Is it here for some reason? We don't just decide these things because you like the construction on every other word in the claim. What I want to know is, was this absolutely determinative of infringement in some sense, or are you just asking us for some advice on the claim? It is related to infringement. Well, every claim term is related to infringement. What I want to know is, is there a holding, a decision, a stipulation, or something that, if we don't consider this claim construction, you're not going to be able to prove your infringement case, for example? Yes. There is a product that involves real-time PCR, and the reason that this issue was litigated and addressed at the district court level to begin with was because of the non-infringement assertions about this particular type of test. But was there a ruling on that infringement? There was no infringement ruling. I see. Only a claims construction ruling. Okay. Thank you. Back to the obviousness question. Yes. The JID article, you would agree, taught the essay and its use in monitoring AIMS theory. So why was that not at a minimum, did that not make it obvious to try in terms of what was ultimately claimed? Because there was no reasonable expectation of success, and we have provided evidence on a number of different levels relating to that. One of the most significant pieces of evidence is the recollection and description, vast description, by Dr. Bulwerding, where he goes through and outlines in detail the great scale of uncertainty at the time that was as a result of the newness of this kind of virus. So your view is that at least it's a question of fact? Yes, at a minimum. And your argument would be that even though there's a finite number, there wasn't an identified, predictable solution. At least that's a question of fact. Yes, and I do just want to confirm that with respect to the number of different possible avenues of research, that unlike the case law that most relies on, it is not the case that it was a matter of simply going down and saying, if I do all of these, I know that one of them will work. That was not at all what the situation was. Is it true that the reference also doesn't describe patients receiving therapy treatment, but rather just patients in general? Yes, that's correct. There is no clinical aspect to the JIT article. And so that was part of the reason why they really made a suggestion that this is something that could provide, may provide a useful marker. You also raised the question of fact, as I understand it, with respect to the level of ordinary skill in the art at the time. Yes. And my question is, to what extent did that enter into the determination of obviousness in this case? Now, obviously it was consideration of the level of skill in the art by the district court, and the district court's opinion discusses at some point the differing views on the level of ordinary skill in the art. It seems like, like in many obviousness cases, there's a determination of the level of ordinary skill in the art, and so it sits there. Now, what difference would it make, what difference did it make in this case? The district court's order, I believe you're correct, does not directly tie any of its conclusions to the level of ordinary skill in the art. It's not unusual. On the other hand, we do believe that some of the other conclusions the district court made that were contrary to its finding of a lack of reasonable expectation of success do sort of bring in and draw from the conclusion on the level of ordinary skill. So it's not just a question in the abstract of determining what the level of ordinary skill in the art is. It's a question of what reasonable expectations persons of ordinary skill in the art at whatever proper level is applicable, would draw in this case. Yes. So all of that, that whole mix of factual questions, in your view, is in play and was not appropriate for summary judgment. That's correct. And in particular, even though we consider them to be factual findings, the ones that she did make that specifically find a lack of a reasonable expectation of success, those and the ones relating to uncertainty, the ones relating to the fact that HIV RNA was not considered to be a proper marker, there are a litany of observations that the court made that under this court's precedent should have set this as an issue of fact to the jury and precluded it from being decided on summary judgment. Among the factors that the court used in order to diminish and move away from the findings on a lack of reasonable predictability were things like financial reward, professional reward, and a cost-benefit analysis. So after making these findings, the district court went on to then say, well, I made these findings, but I don't think I'm done yet, and applied a whole new framework that this court's precedent and Supreme Court precedent has not adopted. There is no basis on which the court could have removed or diminished the requirement of reasonable expectation of success. That was set forth in KSR, that is set forth in every case that this court has decided since, and that includes cases that Rosha cited and we have cited. Do you think that, I mean, in the interview material, we've issued a complaint called Every Cupid, which I think somebody submitted as additional evidence that deals with the obviousness to try. Don't you think that, does that have any effect on this case? It does in the sense that it confirms that reasonable expectation of success remains a requirement. It is not something that's erased. And in fact— But what about on the obviousness to try aspect? Precisely on that topic. That decision states that obviousness to try is tied to a reasonable expectation of success. And I believe it's that decision that then goes through the O'Farrell case, which was decided many, many years ago, and talks about how O'Farrell sort of, not predicted, but also discussed some of the pitfalls of obviousness to try, and the importance of having that reasonable expectation of success requirement there in order to properly bound it. Do you mind if I ask you a question about standing and transition off of obviousness for a second? Sure. Is that okay? Because obviously standing is a predicate for us to sort of even go down this road, really. Well, I want to understand—this pattern is like a law school exam. It's pretty tough. It's very dense. There's a lot going on. So, as I understand it, the Stanford—what you believe is the Stanford assignment is executed first. And then after that, the agreement with CETUS was entered into both by Dr. Polanyi. Polanyi, yes. Polanyi. And are you familiar with Arachnid and Film Tech, our cases on assignments? Yes. Okay. So, as I evaluate these two assignments, it seems to me that their argument is a strong one, that the Stanford assignment was a future promise to assign this, and not a hereby assigns as required by our Film Tech decision, and that therefore the earlier Stanford assignment didn't actually assign anything at all. And while you may well have a claim against Dr. Polanyi for not failing to stand up to his end of the bargain and actually later on assign something to you, that isn't a ground for assertion against CETUS. So, can you respond first to that? I realize that even if I get beyond this argument, there's 15 others related to this topic, but let's kind of go through it a little bit piecemeal, if you don't mind, and go one by one. So, do you want to take a chance and respond to that? The first layer on that argument is the fact that there is the by-goal statutory framework that sits on top of this. And so, in the case law that has been provided to this court, and specifically, for example, the central administration case, the court has found that that framework, that statutory framework, provides for a voidable interest. But you chose to use an arachnid assignment, and thereby you violated the by-goal act. So, you can't sort of seek protection under the very act that you didn't stand up to yourself. Stanford didn't use an assignment clause the likes of Film Tech. They used an arachnid assignment clause. So, how do you gain entitlement or protection under by-goal, given that you didn't actually act consistently with by-goal? By-goal doesn't operate to require to have the actual immediate assignment. It provides for a right to the university or to the government that is a statutory right that gets implicated by the fact that work is done by the government. And that's exactly what happened in the central admin case. In central admin's mixture, the court says, when a violation occurs, that means a violation of by-goals. No, no, no. That assignment, the violation in central admin's mixture, would be a violation by, for example, an inventor who is assigning away a right that should have been, in the first instance, providable to the university or to the government. So, it would happen in central admin's mixture. There are lots of ways to violate by-goal, right? So, Stanford doesn't have a Film Tech assignment. Stanford doesn't have, in effect, the type of assignment that actually assigns the future rights, but rather only promises to assign the future rights. I'm just struggling to ascertain, under those circumstances, how you can seek the protection of by-goal. And that is actually what happened in central admin's mixture. So, in central admin's mixture, there was an assignment by the inventor that violated by-goal. Yes, but in central admin's mixture, the end result of that case indicated that the consequence was the government, therefore, in light of violation, could obtain title. But it didn't say it reverts back to Stanford, or it reverts back to the person who would have been the assignee if there had been an assignment. Central admin's mixture, it seems to me, would help you if you were the government seeking to obtain title, but not help you if you're Stanford claiming that you should somehow benefit from by-goal when you didn't have an assignment. Actually, I think that central admin's mixture does help because Stanford is in the position of the government in that case. In that case, the university said, we are not exercising our right under by-goal. We are allowing you to keep this invention. And then when he went to the government, they said, well, now execute this assignment. This is what we require. And so here, Stanford is in that position, or the positions are switched. The government said, fine, we don't have an issue with this. We're not going to take this from you. Stanford is the one that met all of the obligations to obtain the right. And if you look at central admin's mixture, it says in that case, it actually leaves open the question of whether the government, even at that late stage, could still reach in. The by-goal statute doesn't ever talk about the university having the ability to do that. It talks about the government, but it doesn't give the university that right. I guess I'm still not following you. Only the government has the power to void it. The university doesn't have the power to void a later assignment. Now, you could sue Mr. Halakladny individually, but I don't see how the by-goal imbues to the university the power to void a later assignment. The way I see that case is that the voiding would happen not automatically. And that's one distinction here, is that the automatic nature is not something that we rely on for purposes of by-goal. The voiding, you can read Central Administrative State, would happen if the government at that point said, your failure to execute this assignment means that it's not yours and we can now take it back. And the act of the government taking it back is what would result in the voiding. Okay, you have a whole bunch of other arguments. I don't know how much time you'd like to save for rebuttal, but we can probably address some of them on rebuttal. All right, we'll reserve five minutes for rebuttal, and let's hear from the other side. Good morning, Your Honors. I'd like to start by addressing some of the obviousness issues that were raised and then move on to some of these cross-appeal issues. First of all, the district court, while the court went through a very thorough discussion of all of the factors surrounding this case and obviousness, the decision that the patents were obvious and obvious to try was based on an undisputed record. And here's what's undisputed. The JID article set forth the precise assay that is set forth in these PCR assay patents, right down to the enabling protocol, to the exact reagents and primers that were used. The JID article also set forth- Counsel, isn't there a dispute over what the level of skill in the art is in this case? And isn't all of obviousness from the vantage point of that level of skill? I mean, I understand them to assert that the district court was way off base to conclude that someone with skill in the art would have lots of experience with PCR. In fact, it was in its infancy at the time. Now, just because the inventors knew how to do it doesn't imbue that to, quote, one of skill in the art, because no one really knew how to do it. How is that not critically important to the ultimate determination of obviousness? Your Honor, well, first of all, PCR was- it was early in the development of PCR, but CIDA certainly knew how to do it. They invented it. Isn't this a question of fact? Isn't this exactly- see, what you're raising to me are the alternative factual arguments related to whether the district court's determination of what the level of skill is, is or is not correct. And that's just not province for summary judgment. Well, the reason that the court focused on PCR assays as a level of skill in this art is because these patents specifically are PCR assay patents. Again, you're arguing to me facts. Well, I think the facts were undisputed in the sense that these are PCR assay patents. That's what they're called. Every single patent. That was not disputed, that these are PCR patents, but the level of skill was certainly disputed. Well, the level of skill in the art at that time would have been set by CIDA. The person of ordinary skill, as the court said it, and which was not disputed by Stanford, was quite high. It was a medical doctor or a Ph.D. researcher in molecular biology, both of whom would have been engaged in clinical research involving antiretroviral aid. But that's not the level of skill. It was the additional element of having PCR experience. And I believe that the court focused on that because of this court's decision in the Dietschy case that, you know, really, to have skill in the art of these patents, someone would have had to have been able to perform a PCR assay, because that's really all that's in these patents. In addition to the PCR assay, the only animal— The one of skill in the art wasn't someone who has performed a PCR assay, as you're asserting to us now, but, quote, someone who has conducted numerous PCR assays in conjunction with his research. That's a pretty high level. And I understand all the arguments you're making, and I may not even disagree with them, but they all go to the factual question of what the level of skill should be, which dramatically, it seems to me, would affect the ultimate outcome of the obvious decision in this case. Well, I'm not sure that it would, Your Honor, in this sense. And let me turn to the reasonable expectation of success. This case is very much like the case in O'Barrow that was recently reaffirmed in Ray Kubin. In this case, the Stanford inventors and their CDIS collaborators, who are also the inventors, set out in a peer-reviewed publication, as well as two abstracts that were presented at AIDS conferences, the exact assay method, right down to these enabling protocols, that is in the patents. They taught someone who could do a PCR assay, or perhaps even if they couldn't, how to do a PCR assay that is in these patents. They also told that party why to do this assay. To do this assay because it has already been shown that it can correlate the level of disease state with the amount of HIV titer floating in the plasma. But not testing people in therapy are not related to people who are in therapy, correct? That's a bit of a red herring, and let me explain why. The patients that, unlike the Burroughs case where AZT was tested on rats, the JID article assay was tested on human samples of HIV-infected patients. And there's absolutely nothing different going on in the patents than was going on in the JID article. Whether a patient is on therapy or not on therapy, the exact procedure is taking place. The assay is measuring the level of viral load. Certainly in hindsight, but I think that's part of the factual question, isn't it? Part of the factual question is, would one of skill in the art have known all these things would correlate and play out identically when you choose one of the 20 known methods? I mean, I understand your arguments, but... Well, yes, because the patents are about using HIV RNA as a surrogate marker, and the JID article tells you we've been successful. Isn't that a factual question as to whether or not one... I mean, KSR and post-KSR cases, particularly in the obviousness of the trie, set forth that it has to be a predictable solution. And isn't that really a question of fact as to whether or not one skilled in the art would have viewed it as such? Well, the JID article tells one skilled in the art that they've been successful at measuring the HIV RNA in plasma and correlating it with CD4 count. And they suggest, there's an express suggestion to use this to measure disease stage, as had been done in hope with plasma cultures, the same type of measurement. But there are other articles that suggest that maybe this correlation is not set, that the correlation, that testing the RNA in the plasma is not a proper marker, because that doesn't necessarily give you a correlation in the effectiveness of any therapy. Well, the articles cited by Stanford actually do not teach away, they really only talk about the detection of HIV RNA in plasma. But another important thing about the art cited by Stanford is that the research in those articles took place before the JID article was published. Once the JID article was published, telling a person of ordinary skill in the art how to perform this assay exactly, that they would be able to correlate disease stage and measure the efficacy of drug therapy. But don't we need the additional, you're still missing, I mean, I may have written an article 20 years ago that said that ice cream cures cancer. But when it turns out 20 years later that it's patentable and that it does, I'm not going to get credit for that, unless someone says that one skilled in the art would have read my article and thought that yes, this was a predictable solution. Everybody read it and thought I was just crazy. Well, that's not the record. It actually was considered to be one of the most significant and important articles of its time, and that the Stanford doctors then went back and validated this assay almost immediately. In fact, it's barely prior art, they filed for their patent, you know, a little over a year after this article had come out. I think the bigger question is whether the JID article's assay can be taken out of the public domain and given to Stanford when that is really the only thing in the patents. There's nothing else in those patents that's patentable. Counsel, we're not deciding, they're not asking us to decide that the patent's not obvious, but only were there facts that would preclude appropriately doing so on summary judgments. So the argument you just made would be appropriate, it seems, if we were on the verge of saying the patent is valid and not obvious, but doesn't sort of apply in the context of the procedural posture in this case. Well, I think another argument that we've raised that the court might consider is whether these patents are anticipated and inherently anticipated by the JID article. That was an argument that we raised in our pleadings. It was not addressed on summary judgment, but this court can confirm that summary judgment on any grounds presented and supported by the record. And as the district court found, and I think as you go through these claims, the JID article, the JID assay obviously is exact in the patents. And what is not exact is the patient data that they throw in there that is really the result of performing this assay. But, of course, it was the only intended use of this assay. There was no other purpose for this assay other than gathering this patient data. I keep going back to the same thing that seems to be fatal to your anticipation argument, the same thing I kept raising in obviousness, which is these patients who were tested weren't undergoing therapy. And you can't, they presented factual evidence. I can't necessarily inherently assume that people undergoing therapy would, everything would correlate identically because they presented a lot of evidence that the therapies were unpredictable and didn't necessarily correlate. And whether it's true or not, it's a factual dispute in the record that would inhibit inherency, which you need, because clearly it doesn't. The claim requires people in therapy, and the JID article makes clear that it does not pertain to people undergoing therapy. So you need inherency to get there. Inherency has those factual questions, and they showed unpredictability. Inherency requires absolute, not even 50 percent or 90 percent, but absolutely every time. But I think what's important there is to recognize that the patents do not test drug therapy. They don't test anything related to drug therapy. All they do is measure. But there's a claim limitation that requires this. The anticipated reference must have all the elements. Actually, no. The claim limitation is a doctor reading the results of the assay, which could be CD4 count, could be, you know, P24, antibodies, could be anything, any count that you want to take. This assay measures the level of viral load. And that's all the assay does. The assay doesn't tell you that the therapy is effective based on the drug or ineffective based on the drug. It just tells you whether the viral load- If you have a patient who is being treated with an antiretroviral agent, that's element one. How does that not require someone being treated, which is not what the JID article referred to? Well, it can't require someone being treated. But the important thing is that the JID article also- No, no, no. To be infringing it must. That's a claim limitation. You certainly wouldn't argue that we can ignore claim limitations for infringement purposes. No, I would not. So we can't ignore them for validity purposes either. But I think the important thing is that the JID article sets forth an assay that was performed on HIV-infected patients. And the only thing the assay is measuring is does the viral load go up? Is the patient sicker? Or does the viral load go down? Is the patient getting better? That's all this assay does. This assay doesn't address in any other respect whether the patient on treatment, you know, whether the particular type of treatment. Also, I think from an obvious perspective, it's very important to consider that the Ho reference years before that, which is cited in the JID article, did measure HIV titer in patients that were taking AZT. They were on drug therapy. And, you know, there was nothing new about this. And Ho concluded that the HIV amount of viral load increased when the patients were not responding to AZT and decreased when they were responding to AZT. I would also submit that in this record, there's been some discussion of the 1988 interleukin trials. Interleukin was an AIDS drug that was tried in the CITUS-Stanford collaboration and was not very successful. You want to cover your counterclaim, don't you? Yes, I do. Let me turn to the VCA assignment. I don't think there's any question that under the sports precedent in Film, Tech, and Speed play that CITUS, that Hladny and Stanford assigned Hladny's patent rights to CITUS in the VCA agreement. This court has noted the fact that the earlier Stanford contract is one that falls under the Arachnid case. It was a contractual promise, a future promise to assign. What is also, I think, important about that is that that employment contract really envisioned what we have here as a matter of public policy. Stanford sent its researcher to CITUS to do precisely, to use CITUS as proprietary materials, facilities. Okay, let's, well, we can get past that to the statute of limitations issue, which is what I have difficulty. Because I understand that the district court here said, uh-uh, you can't assert your ownership because the statute of limitations is wrong. Why is that wrong? Well, first of all, it's wrong under this court's precedent in Film, Text, Speed, Play, and DDB. Because the moment that that invention came into being, it was automatically assigned to CITUS. Under this court's precedent, no further act needed to be taken. It's an automatic assignment. That was an assignment of expected patent rights, which as soon as they were realized, as soon as that invention was conceived, was owned by CITUS. And neither CITUS nor Roche, who later became the owner of that contract and those assets, had to take any steps in order to effectuate that ownership. That had already occurred. That's the first argument on statute of limitations. There are actually two others. The other argument is that we raise this as a defense. Whether or not the assignment, you know, devolved for the benefit of Roche, which, by the way, is undisputed on this record. Stanford has not said that Roche doesn't own that assignment. But even if it didn't, CITUS did. And there's an assignment that can be raised as a defense because this automatic assignment took place under Film Tech and Speedplay, and Stanford doesn't have exclusive rights. So in other words, are you saying that we weren't seeking to expand our ownership, right? Roche, that is. But we were simply arguing that Stanford didn't have standing to proceed. We're doing both. But we're saying that even if the court disagreed that Roche owned And, by the way, I would make the point, too, that our counterclaims are broader than Stanford's claim on these asserted patents. Roche's counterclaim also covers a patent application and four unasserted patents. But, counsel, it seems to me I want to stay with Judge Prost's statute of limitations issue. This is something that's bothering me as well. And it seems to me that maybe you can make a distinction for your defense. You can't time bar standing. And standing is your defense. But that doesn't hold water for your ownership counterclaim because that is an affirmative claim that you're making. And the statute of limitations, it seems to me, is certainly fair game for an ownership claim. Is that the way you understand it as well? Well, I understand that it would be fair game, but for this court's precedent that the rights were assigned. But I have another point I would make. I disagree with that last part, though. You would agree that an ownership, an affirmative claim, your claim to entitlement could be time barred by a statute of limitations. But you would say to the extent we're using our ownership simply to affect a standing issue that certainly courts have said for a long time standing can't be time barred as a defense. Yes, this court is correct. From a purely ownership point of view, we would take this position that under DDB, from a purely counterclaim ownership point of view, as DDB said, statute of limitation has no place when there's an automatic assignment. But one other point I want to make, which we did make in our brief, is that there are three patents here. Hold on. Let Judge Post ask her question before we move on. Moving on to the next one, actually, maybe you can touch on this. One thing I was confused about is in the obviousness, it seems like claims were asserted on three patents, the 730, the 705, and the 41. That's correct. But across claims, as I read it, only that Roche only asserted ownership with respect to two patents, the 705 and the 730. Am I wrong about that? Yes, Your Honor. You are incorrect about that. The 041 patent, the last patent, actually issued a year after the suit was filed. I mean, it could not possibly be barred by statute of limitations. Roche amended its counterclaims to then assert invalidity and all of its other counterclaims of ownership with respect to the 041 patent as well. And that was exactly where I was going to go, is that there are three patents here, and patent number two, the 705 patent, issued two years before the suit was filed and couldn't possibly be the subject of a limitation. The 041 patent, issuing a year after the suit was filed, couldn't be the subject of a limitation. Well, I'm not. I mean, I think the court, when the court said we ran the statute of limitations, what date was the court using? The court was not using the date that the patents were issued. No, but that's the date that this court uses in its precedent as the date that you must use for the statute of limitations and for latches, that each patent has its own chosen action. And you don't start counting statute of limitations on a patent or latches on a patent until the patent issues. The court did not take that into consideration. The court only took into consideration the timing of the first patent with respect to limitations. All right. Now, we'll reserve five minutes for a rebuttal. And let's hear from Mr. Rodriguez. Thank you. Thank you. I just want to touch quickly again on the Bible issue. That statutory framework is not limited exclusively to determining the rights of the government with respect to inventions that are funded by government grants. It addresses university rights. It addresses inventor rights as well. And it requires an inventor to take certain steps in order to obtain rights. One of those steps is to obtain permission from the university in terms of the university's choice to obtain rights. So what the Bible framework does is that it makes sure that from the moment that work is done based on a government grant, any interest that an inventor would have is contingent. It is not a full interest. It is contingent upon meeting all the requirements in Bible, one of which is that the university has to allow the transfer to happen. In this case, not only did the inventor have to go through and comply with all of those requirements in order to obtain title, as the inventor in the central administrative attempt to do, but the university itself decided to retain the title to the invention so the inventor could not and did not, Dr. Halagian, did not obtain any rights to that. I also want to point out on this, there are a number of subsidiary issues here, fact issues that also preclude summary judgment on this. The argument relating to ownership requires the conclusion that the invention itself to begin with was something that fell within the DCA. And that is an issue of fact that we believe should have gone and should go to the jury. But wait, on the ownership, you prevailed, right? Yes. And so what are you saying? At a minimum, even if we have a problem with what the district court did, that should have summary judgment on the other side? With respect to the issues that Roche is raising. So Roche is asking that the court's decision on ownership be overturned. And what we're saying is to the extent that we don't believe that should happen, but to the extent it does, it's not a reversal, it's a remand for a trial. On the ownership issue, as I understand the district court, she started the clock running on the statute of limitations at what point? It was in 2000, although the initial internal memo that was circulated within Roche was in 1999. And so if her decision became law, that would compel folks to be running in the court to assert ownership rights even without a patent having been issued, without any potential necessarily for any infringement litigation down the road. Doesn't that seem peculiar to you? Well, there is one issue there with respect to the issuance, and that is that the 730 patent, all these patents are related. So as soon as that patent issued, the original application became public. And so the notice was appropriately asked to all patent applications that were related to that. And that is fair. If you've got notice that somebody has patented and submitted a patent application on what you believe to be your invention, then the clock should start to run. I thought the patents issued in 2003 and 2005. Those were the later ones. So the initial patent, the 730 patent issued in 1999. The statute of limitations argument only pertains to the 730, right? To all of them. Yeah, that's my concern. So you would concede that the statute of limitations decision, at least with respect to the latter two issued patents, is properly matched? No, because they are all related. They all come from the same underlying patent application. In terms of what it is that Roche believes in and owns, it is all there. It is all written out. Stanford's assertion... If the patent is donation, how is Roche on any notice that the patents were even filed that are there? How could they take action? What could they do? Because the 730 patent is based on the exact same patent application. There is no notice of any different claims or any different... There is nothing different other than the specification may be the same. The disclosure is known, but there is no knowledge with respect to any separate claims in any separate patents. But that disclosure itself describes all the possible inventions that could be claimed. That is notice that this is something that Stanford believed was theirs. No, no, no, no, no. Only the claims cover the scope of what someone is claiming to be their invention. Specifications always contain sections discussing prior art, discussing things broadly. But the claims are what define the scope of invention, not the specification. So why should the specification be viewed as putting anyone on notice that Stanford claims... or that anyone claims entitlement to everything in the spec? That would be a very unusual thing, it seems to me. At a minimum, a patent application is required to have claims. Okay, I don't think anyone is disputing that. All right. All right. Time has expired, so let's hear from Pruitt on the rebuttal on the cross-appeal. Can I ask you something about the statute of limitations that is troubling me, which is that the court determined that this was a cross-appeal. That this was a cross-appeal of a non-defense. Cross-appeal. That's what comes by a non-defense. Don't we have to show an extraordinary deference to that determination? Well, this is a summary judgment decision, and I believe that the review is to know those. So I would say not. But to the extent that you continue to adhere to the fact that you are inserting your own ownership claim and not just a standing defense against Stanford, why is that not truly a counterclaim where the statute of limitations might be in play? Well, I think the way I would respond to that is to say that it doesn't have to be either or. We can have a counterclaim asserting Roche's rights, but we can have an assignment defense saying you gave these rights to Cetus. Whether or not the court decides to give them to Roche, you gave these rights away to Cetus in that BCA assignment, and therefore you don't have standing. And that's where we would make the distinction. The court did not really look at it from that point of view at all. She lumped it all together, but I don't think that you necessarily have to do that. Is there any case law that deals with the statute of limitation issues with respect to patent cases where there's an assertion of ownership as either a defense or a counterclaim? Not specifically patent cases, no. We certainly found a lot of general law relating to defenses not being borrowed by the statute of limitations. But specifically as to patents, no. The only limitations law that we came across with respect to patents was this court's precedent, which we cite on page 25 of our reply brief, the Stark v. Advanced Magnetics case, that talks about neither limitations nor latches beginning to run until the date of patent issues, I think for all the reasons the judge mentioned earlier. And let me take a moment on Dido, and if I may, I'd like to just take a moment on our license issue, which didn't get addressed the first time around. It wasn't addressed the first time around. It's not proper. Your adversary won't have a chance to reply. But Dido was fair there. Okay. Well, with respect to Dido, let me just say that nothing in the Dido Act, and I think this court's decision in central admixture confirms this, forces a forfeiture of rights or speaks to the inventor not owning the inventor's invention or not having the ability to assign it. Stanford's argument that the inventor has only a contingent interest just doesn't have any support in the law, and none has been cited to support that. I think that the court has to also look at Baydol in its broader context here as a policy. This is a situation where Stanford, never having produced even a funding agreement in this case to show its own rights settled as between government, sends a researcher to have access to proprietary facilities, has a researcher execute on its own behalf a contract giving up patent rights, and then claims that Baydol allows it to margin, basically, have government-type margin rights to void that assignment. I don't think anything in Baydol speaks to that, but I think that the whole reason for Baydol speaks against that. The whole reason for the Baydol Act was to foster collaboration between universities and industries so that industry could commercialize these inventions that were created as part of government funding for the public good, exactly as Roche did here. Roche has actually been selling this HIV assay kit that's at the heart of this case since 1996 to Stanford, and nine years later, Stanford comes out with this patent and sues Roche on it and claims that all of these contracts signed, and I won't mention the license, but the BCA assignment, that none of that matters, that they just can undo that completely because of the Baydol Act. I don't think the Baydol Act allows them to do that. The other point I wanted to make about our counter plans, and I just want to refer the court to the very last paragraph of the district court's decision in granting summary judgment, the earlier summary judgment, finding that the Baydol Act barred the BCA assignment and also finding statute of limitations. We did not move for summary judgment, although we had a counter claim addressed to Stanford's pending patent application and four other patents that come off of the same specification but were the subject. It was a divisional application. They became four other patents. The court granted summary judgment as to those and dismissed our counter claim based on these same arguments. So that's why I mention the fact that our cross-appeal is broader than the asserted patents because the court disposed of our counter claims on those patents and that pending application on these same Baydol and statute of limitations grounds. And I see I'm out of time, so if the court has any more questions. Thank you so much. Thank you all for coming.